Donna FISHMAN, Plaintiff, Appellee,

v.

William J. CLANCY, Defendant,
Appellant.

Donna FISHMAN, Plaintiff, Appellee,

v.

William J. CLANCY,
Defendant, Appellee,

Stephen Coppinger,
Defendant, Appellant.

Nos. 84–1753, 84–1754.

United States Court of Appeals,
First Circuit.

Argued March 5, 1985.

Decided June 10, 1985.

Benjamin V. White, III, Providence, R.I., with whom George M. Vetter, Jr. and Vetter & White, Providence, R.I., were on brief for defendants, appellants.

Lynette Labinger, Providence, R.I., with whom Roney & Labinger, Providence, R.I., was on brief for Donna Fishman.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

COFFIN, Circuit Judge.

Defendants-appellants are the superintendent and a principal in the East Greenwich, Rhode Island, school district. A jury found that they retaliated against plaintiff, a teacher in the school system, for her exercise of First Amendment rights. The jury returned a verdict against the superintendent, William Clancy, in the amount of $5,036.42 compensatory damages and $39,000 punitive damages. The verdict against Stephen Coppinger, the principal, was for $5,036.42 compensatory damages and $26,000 punitive damages. Defendants appeal on several grounds. They claim that plaintiff failed to present sufficient evidence that they violated her civil rights, and that the district court thus erred in denying a directed verdict or judgment notwithstanding the verdict. They also argue that the punitive damage awards were unwarranted and excessive, and that the amount of attorneys fees awarded was unjustified. We affirm.

## I. *Sufficiency of the Evidence*

It is well established that a motion for judgment n.o.v. "should be granted only upon a determination that the evidence could lead reasonable men to but one conclusion, a determination made without evaluating the credibility of the witnesses or the weight of the evidence at trial", *Hubbard v. Faros Fisheries, Inc.,* 626 F.2d 196, 199 (1st Cir.1980); *Cazzola v. Codman & Shurtleff,* 751 F.2d 53 (1st Cir.1984). We review this evidence, as we must, in the light most favorable to the plaintiff. *Borras v. Sea-Land Service, Inc.,* 586 F.2d 881, 885 (1st Cir.1978); *Dumas v. MacLean,* 404 F.2d 1062, 1064 (1st Cir.1968).

Plaintiff joined the East Greenwich schools in 1975 to set up a new reading program. She had taught for 10 years in public schools in the City of Pawtucket where she had a good record and had been given tenure. Plaintiff's conflicts with the administration of the East Greenwich schools began three years after she started there, in September 1978, when she filed her first grievance under her union contract. She filed a second grievance in April 1979. Also during 1979, plaintiff received criticism for counseling two students who wished to file appeals of discipline imposed on them.

The most bitter dispute between plaintiff and defendants arose in March 1980 when plaintiff learned that defendants planned to recommend a cutback in the high school reading program which she taught. She repeatedly urged them to reconsider their decision, and objected as well to her reassignment to teach high school English. When the proposed change in the program was presented to the School Committee in June 1980, plaintiff publicly challenged the wisdom of defendant Clancy's proposal at a heavily attended meeting. She later criticized Clancy's conduct at the meeting in a letter to the editor published in the local newspaper. In another apparent expression of displeasure at the proposed changes, plaintiff got herself "decertified" so that she would be unable to teach high school English. Despite plaintiff's objections, the reading program was reduced and, as a result of changes in her teaching assignment, plaintiff filed two more grievances, bringing her total to four, more than

any other East Greenwich teacher had ever filed.

The four grievances, the student counseling and the public criticism of the reduction in the reading program are the First Amendment activities for which plaintiff claimed the defendants retaliated against her. The alleged retaliation first took the form of an unlawful and unjustified termination for an incident which occurred February 9, 1981. On that date, plaintiff wrote a note to another teacher asking that a student be excused from the other teacher's class so the student could take a required test in plaintiff's classroom. The note was untrue; the student, in fact, sought to discuss a personal problem with plaintiff. Instead of meeting with plaintiff, however, the student left school grounds without permission. Principal Coppinger brought the incident to the attention of superintendent Clancy and, on February 13, Clancy sent plaintiff a letter notifying her that she was terminated as of that day.

Defendants' behavior toward plaintiff in response to this incident was irregular in a number of ways. Although Coppinger had met briefly with plaintiff to discuss the untrue note before Clancy sent the termination letter, Clancy did not discuss the incident with her despite his usual practice of meeting with both the teacher and a union representative when a problem arose over a teacher's performance or professional conduct. The evidence suggested that Coppinger did not tell Clancy of plaintiff's explanation for writing the note, the testimony also indicated that Clancy told the School Committee that plaintiff had discharged the student from school rather than having excused her only from another teacher's classroom to come to her own room. Moreover, Clancy did not have authority under state law to terminate plaintiff, a fact to which defendants stipulated. Although Clancy attempted at trial to suggest that his letter of termination was meant only to *start* the termination process, a jury certainly could have discounted his explanation in light of the wording of the letter, which stated, in part, "You are hereby notified that you are being termi-nated as a teacher in the East Greenwich Public Schools, effective February 13, 1981" (the date of the letter). The School Committee, in fact, seemed to acknowledge the impropriety of Clancy's action by reinstating plaintiff and treating the time she missed from work as a suspension with pay.

Plaintiff contends that the retaliation continued following her reinstatement, and she has pointed to several specific episodes. First, shortly after she returned to work, she took three days off to take care of matters associated with her aunt's death. Upon her return, she filled out the required form to explain her absence, and checked the reason as "death in the family". The union contract did not provide pay for an absence connected to an aunt's death, and plaintiff testified that she knew she was not entitled to pay and did not claim it. Nevertheless, both Coppinger and Clancy responded to plaintiff's absence form as if she had attempted to deceive them into paying her for the days she missed. Clancy sent her a harshly worded letter questioning her "unauthorized absence" and suggesting that he was considering further job action. Other teachers had reported similar absences the same way but had never received such a letter.

The next incident in the alleged campaign of harassment was plaintiff's reassignment to teach elementary grades in fall 1981. She had never taught at the elementary level in East Greenwich, had not done so for many years before she left Pawtucket, and felt ill prepared for the position. She considered the assignment retaliatory because a reading and study skills position, her area of specialization, was available at the junior high school.

The final incident occurred when plaintiff applied to fill a posted vacancy for a reading specialist position. Clancy rejected her application despite her seniority and extensive experience as a reading specialist, while the teacher selected had little experience in that area. Plaintiff filed a grievance and an arbitrator ruled that Clancy

had violated a collective bargaining agreement when he chose someone with less seniority and experience. Plaintiff was then assigned to the reading specialist job.

Appellants respond to these allegations of retaliation by noting plaintiff's improper conduct, and asserting that they were just doing their jobs when they took actions against her. They imply that they would have done nothing differently in the absence of plaintiff's first amendment activities and they urge upon us the admonition in *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 285–86, 97 S.Ct. 568, 50 L.Ed.2d 471 (1976) that a teacher with an otherwise tenuous employment status not be placed in a better position as a result of the exercise of constitutionally protected conduct than she would be in without such conduct. They emphasize the eight-month lag between the most serious conflict—the public confrontation of Clancy about the reading program—and plaintiff's termination, and argue that it is not enough for plaintiff simply to show an adverse employment decision sometime after engaging in constitutionally protected activity.

We agree that the simple fact of plaintiff's termination eight months after the public controversy over the reading program is not enough to show a violation of her constitutional right of free speech. But as the preceding factual summary demonstrates, that is not all plaintiff proved. While it is true that the picture presented at trial was a mixed one, showing plaintiff to be an outspoken teacher who resisted her superiors' program changes by making herself ineligible for her new position and who lied in a note to another teacher, the evidence was more than sufficient to support plaintiff's tale of retaliation for the exercise of her First Amendment rights.

Although it can be argued that the school district's internal remedial procedure tended to protect plaintiff by preventing the defendants from succeeding in their efforts to discharge or reassign her, defendants properly conceded that if they unjustifiably acted in response to her First Amendment activity, their conduct would amount to unlawful harrassment. In respect to this contested question, our task is not to determine whether the evidence would have supported another verdict besides the one the jury reached, but only to decide whether the chosen verdict is supportable. And this one is. In deciding the liability issue in this case, the jury could have concluded that defendants retaliated against plaintiff for her exercise of First Amendment rights by, *inter alia*, ordering a termination they were without power to order, unjustifiably threatening another firing shortly after the school district reinstated plaintiff, and then depriving her of a job to which she was entitled. We must assume that the jury did so find because they were instructed several times to decide whether the defendants retaliated against the plaintiff specifically because she exercised her constitutionally protected right to free speech. We agree with the summation of the evidence given by the district court in response to defendants' motion for a directed verdict:

"[D]epending upon the inferences that the jury chooses to draw from the abundance of facts ... the course of conduct entered into and carried out by the defendant Clancy, and to a lesser, but nevertheless actionable extent, by the defendant Coppinger, can be viewed either as a legitimate response to the demands and exigencies of the operation of the school system and the running of the school or can be viewed as [a] virtually classic case of retaliation against a teacher, who, for reasons [at] least arguably related to her rather vigorous exercise of a variety of First Amendment rights, managed to get herself on the defendant's [sic] hit list, so to speak."

The eight-month delay between the School Committee meeting and plaintiff's termination is not so long as to remove an inference of retaliation and where state of mind is crucial to the outcome of a case, "jury judgments about credibility are typically thought to be of special importance", *Stepanischen v. Merchants Despatch*

*Transp. Corp.,* 722 F.2d 922, 928 (1st Cir. 1983). The district court, who observed first-hand the testimony of the defendants, described them as neither "particularly good [n]or as particularly forthcoming witnesses." We would be misusing our power of review if we were to find that the district court abused its discretion in upholding a jury verdict which was sufficiently supported in the record and consistent with his view of the witnesses' credibility. We therefore uphold the district court's decision against granting judgment notwithstanding the verdict. We similarly uphold its decision not to grant a new trial. *Rios v. Empresas Lineas Maritimas Argentinas,* 575 F.2d 986, 990–91 (1st Cir.1978).

## II. *Punitive Damages*

■ Defendants claim that the punitive damage awards of $26,000 against Coppinger and $39,000 against Clancy are "unjustified, excessive, and unwarranted." We note first that defendants failed to object to the submission of the punitive damages issue to the jury and that this omission in itself is ordinarily enough to preclude an argument on appeal that plaintiff produced insufficient evidence to justify punitive damages. *Abraham v. Pekarski,* 728 F.2d 167, 171–73 (3d Cir.1984), *cert. denied,* — U.S. ——, 104 S.Ct. 3513, 82 L.Ed.2d 822.

■ Moreover, it was not error for the court to allow the jury to consider a punitive damages award. " 'If the plaintiff proves sufficiently serious misconduct on the defendant's part, the question whether to award punitive damages is left to the jury, which may or may not make such an award.' D. Dobbs, Law of Remedies 204 (1973) (footnote omitted)", *Smith v. Wade,* 461 U.S. 30, 52, 103 S.Ct. 1625, 1638, 75 L.Ed.2d 632 (1983). We are hard pressed to find error in the district court's upholding a jury determination that defendants' campaign of harassment constituted an outrageous course of conduct justifying punitive damages. The district court carefully instructed the jury that it could not award punitive damages unless the plain-

tiff proved, by a preponderance of the evidence, that the defendants "acted with reckless or callous indifference to the plaintiff's constitutional rights, or with evil motive or intent." The court then emphasized that punitive damages "are designed by the law to punish extraordinary misconduct."

■ In an effort to show that the necessary level of egregiousness does not exist here, defendants compare their improper actions to other types of civil rights violations that have been found to support punitive damages. They point to the "odious" racial discrimination in *Heritage Homes of Attleboro v. Seekonk Water District,* 648 F.2d 761, 763 (1st Cir.), *vacated on other grounds,* 454 U.S. 807, 102 S.Ct. 81, 70 L.Ed.2d 76 (1981); the "outrageous" and improperly motivated invasion of privacy by police officers in *Caperci v. Huntoon,* 397 F.2d 799, 801 (1st Cir.1968), and the vicious beating by a police officer in *Vetters v. Berry,* 575 F.2d 90 (6th Cir.1978). Defendants seem to suggest that retaliatory dismissals for exercise of First Amendment rights would rarely, if ever, justify punitive damages. We think this attitude belittles the First Amendment. It is more appropriate to consider whether defendants' conduct amounted to an outrageous violation of First Amendment rights than to consider whether it was outrageous when compared with the actions of a police officer who brutally beat and illegally arrested a man. In that light, we can not say that the series of incidents alleged by plaintiff and detailed above are, as a matter of law, insufficient to support a punitive damages award.

■ The issue of amount is more difficult. Under the standard of review applicable with respect to civil jury awards, "the jury's otherwise supportable verdict stands unless 'grossly excessive' or 'shocking to the conscience.' " *LaForest v. Autoridad de Las Fuentes Fluviales De P.R.,* 536 F.2d 443, 447 (1st Cir.1976). In performing our review, we must accord broad discretion to the trial court's determination because it "has had the benefit of hearing the testimony, of observing the demeanor of

witnesses and also knows the community and its standards", *Boston and Maine Railroad v. Talbert*, 360 F.2d 286, 291 (1st Cir.1966); *Bonn v. Puerto Rico International Airlines, Inc.*, 518 F.2d 89, 94 (1st Cir.1975).

The district court in this case considered the award high, but not excessive. It noted that the jury had awarded different amounts against each defendant, suggesting that the jury had carefully considered the question of punitive damages. We, too, consider the awards to be high, but we cannot say they are irrational, or shocking. This was not a case in which a defendant took one improper action in response to protected speech, *see Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir. 1977), but a case in which evidence showed defendants overreacted and repeatedly bypassed normal procedures in retaliating against an employee's outspokenness. The defendants were less than model witnesses, and it appears to us that the jury may well have determined that only a high award adequately would serve as punishment and deterrence for such individuals, and that the $5,000 compensatory award against each defendant was insufficient for that purpose. *See* Restatement (Second) of Torts § 908(1) (1979) (punitive damages are awarded in the jury's discretion "to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future"); *Smith v. Wade*, 461 U.S. at 54, 103 S.Ct. at 1639, and compare *Alicea Rosado v. Garcia Santiago*, 562 F.2d at 121 ("An award of actual damages coupled with reinstatement ... is ... a sufficient deterrent to future wrongdoing"). The jury also may have been motivated by the severity of plaintiff's reaction to defendants' actions. Immediately after the incident related to her absence for her aunt's death, she suffered an emotional breakdown which caused her to take a leave for several months. It was upon her return from that leave that she was rejected for the reading specialist position to which she was entitled.

We also note that defendants failed to create a record of their financial capabilities, and thus we are unable to say that these awards are shocking because of the particular impact on them. Defendants' assertion in their appellate brief that the awards would "figuratively send two school administrators to the poorhouse without a speck of evidence by plaintiff of their ability to pay" does not take the place of evidence presented at trial. *See Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir.1978) ("[T]he decided cases and sound principle require that a defendant carry the burden of showing his modest means—facts peculiarly within his power—if he wants this considered in mitigation of damages."). Defendants chose not to offer proof of their financial conditions despite their awareness of plaintiff's request for punitive damages. Thus, we reject both the argument that these awards are so excessive on their face that they cannot stand, and the argument that the amounts are shocking specifically with regard to these defendants.

"The jury here returned verdicts for compensatory and punitive damages after having been instructed by the trial judge in detailed and easily understandable language as to the type of proof necessary (guidelines) for the jury to consider in determining whether or not damages should be awarded to plaintiff against defendant(s). The jury had listened to substantial evidence of the elements necessary to award both types of damages. Under these circumstances this Court will not invade the particular province of the jury in evaluating the value of plaintiff's civil rights." *Vetters v. Berry*, 575 F.2d at 97.

## III. *Attorney's Fees*

Defendants argue that in awarding attorney's fees the district court failed to consider adequately that plaintiff succeeded on only one of three counts in her complaint. They assert that the court "without explanation" awarded plaintiff $17,958.50 out of the $21,701 for which she applied. To the contrary, the district court carefully con-

sidered that a plaintiff is not automatically entitled to all of her attorney's fees in a case in which she prevailed on some but not all claims, and it cited to the controlling precedent on this issue, *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The district court also referred to the doctrine, enunciated in *Hensley,* that in cases in which several claims arise from a common nucleus of facts and involve related legal theories "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation", *id.* at 435, 103 S.Ct. at 1940.

After noting the applicable precedent, the district court stated that it believed some offset was appropriate because of the two unsuccessful claims but that the time related to those two claims did not represent "a material or substantial increase in the time expenditure necessary for this case." It stated that both unsuccessful counts were "factually sisters" to the successful one, "exactly the identical facts were involved in all three counts, and the precise differences which dictated different results ... was not one of fact, but one of law...."

■ As a result of its examination of plaintiff's time records, the district court subtracted 15.6 hours associated with the two unsuccessful claims, excluded another 12.5 hours as an unjustifiable expense to impose on defendants, reclassified 7.8 hours to a lower rate category and made adjustments to the amounts requested by an associate of plaintiff's primary lawyer. "Where, as here, the district judge gives consideration to the relevant *Hensley* factors, its judgment is entitled to stand absent an abuse of discretion", *Garrity v. Sununu,* 752 F.2d 727 (1st Cir.1984). We find no abuse here and, accordingly, sustain the award.

*The judgment of the district court is affirmed.*