Celia G. ZIMMERMAN, James
Zimmerman, Plaintiffs,

v.

**DIRECT FEDERAL CREDIT UNION,**
David Breslin, Defendants.

No. CIV. A. 97–12610–RBC.[1]

United States District Court,
D. Massachusetts.

Nov. 16, 2000.

Juliane Balliro, Robert D. Friedman,
Edward N. Perry, Perkins, Smith & Co-
hen, Boston, MA, for plaintiffs.

A. Van C. Lanckton, Karen E. Romito,
Craig & Macauley, P.C., Boston, MA, for
defendants.

**MEMORANDUM ON DEFENDANTS'
RENEWED MOTION FOR JUDG-
MENT AS A MATTER OF LAW OR
FOR NEW TRIAL OR REMITTI-
TUR (# 200)**

COLLINGS, Chief United States
Magistrate Judge.

### I. Introduction

On the fifteenth day of trial the jury
returned a split verdict, favoring the plain-

1. With the parties' consent, this case has been
referred to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

tiff Celia G. Zimmerman ("Zimmerman") on certain of her claims and the defendants Direct Federal Credit Union ("Direct") and David Breslin ("Breslin") on others. More specifically, on the claims submitted to the jury for determination[2] Zimmerman was awarded $200,000 in compensatory damages on her claim of retaliation under state law against both defendants, $400,000 in punitive damages jointly and severally against both defendants, and $130,000 in damages on her claim for intentional interference with advantageous relations against Breslin. Direct and Breslin successfully defended against claims of gender/pregnancy discrimination, violation of the Family Medical Leave Act, and loss of consortium.[3]

The defendants now move for judgment as a matter of law pursuant to Rule 50(b), Fed.R.Civ.P., with respect to the tortious interference claim and the award of punitive damages contending that no adequate evidentiary basis existed to support those aspects of the jury verdict. In the alternative, Direct and Breslin seek either a new trial pursuant to Rule 59, Fed.R.Civ.P., on the tort and punitive damage claims or an order of remittitur on the $400,000 award.[4]

## II. Judgment As A Matter Of Law

The Supreme Court recently had occasion to provide further guidance with respect to the standard to be applied in deciding the motion at hand:

> Under Rule 50, a court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. Rule Civ. Proc. 50(a); *see also Weisgram v. Marley Co.*, 528 U.S. 440, ——, 120

S.Ct. 1011, 1016–1018, 145 L.Ed.2d 958 (2000).

\* \* \* \* \* \*

In the analogous context of summary judgment under Rule 56, we have stated that the court must review the record "taken as a whole." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). And the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record.

In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–555, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990); *Liberty Lobby, Inc., supra*, at 254, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202; *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, n. 6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby, supra*, at 255, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving par-

---

2. Certain counts of the amended complaint were resolved via summary judgment and another was withdrawn by the plaintiff.

3. The loss of consortium claim naming Breslin as the defendant was the sole claim advanced by the plaintiff James Zimmerman.

4. According to the defendants, no challenge is being made to the jury verdict on the retaliation claim in light of the First Circuit decision of *Simas v. First Citizens' Federal Credit Union*, 170 F.3d 37 (1999).

ty that the jury is not required to believe. *See* 2 Charles A. Wright § 299. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.*, at 300, 106 S.Ct. 2505.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, ——–——, 120 S.Ct. 2097, 2109–2110, 147 L.Ed.2d 105 (2000).

With the legal context established, the first claim to be examined is the state law tort of intentional interference with advantageous relations.

The elements of the tortious interference claim are by now familiar:

> To establish intentional interference with contractual or business relations, the plaintiffs must show (1) the existence of a contract or a business relationship which contemplated economic benefit; (2) the defendants' knowledge of the contract or business relationship; (3) the defendants' intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages. *See United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 815–817, 551 N.E.2d 20 (1990).

*Swanset Development Corp. v. City of Taunton*, 423 Mass. 390, 397, 668 N.E.2d 333, 338 (1996); *Shafir v. Steele*, 431 Mass. 365, 370 n. 10, 727 N.E.2d 1140, 1144, n. 10 (2000).

The jury in this case was instructed in those terms, and, indeed, the defendants take no umbrage at the charge:

**5.** The phrase "improper in motive or means" was defined for the jury in the following manner:

> Now what is the meaning of the term "improper motive or means?" Simply stated, interference for a motive or means is "improper" in this context if it is done with actual malice, that is, done with a spiteful malignant purpose unrelated to legitimate

Ms. Zimmerman's last claim is only against David Breslin. She claim (sic) that she had an employment relationship with Direct which was advantageous to her and that Mr. Breslin intentionally interfered with that relationship. In order to prove that claim, Ms. Zimmerman must prove by a preponderance of the evidence that, one, she had an advantageous employment relationship with Direct; two, Mr. Breslin knew about the relationship; three, Mr. Breslin knowingly interfered with the relationship; four, the interference was improper in motive or means; and five, and that Mr. Breslin's interference was the cause of an injury or damage to her.

TR 14 at 106.

The defendant's contention is that Zimmerman failed to prove that any actions of Breslin, a corporate officer of Direct and the plaintiff's ultimate supervisor, were "improper in motive or means."[5] Under Massachusetts law, "[i]n the employment and discharge context, the law of this jurisdiction seeks to protect a corporate official's freedom of action by requiring proof that the official acted with actual malice." *Alba v. Sampson*, 427 Mass. 1104, 44 Mass.App.Ct. 311, 314, 690 N.E.2d 1240, 1243 (1998), *further appellate review denied*, 427 Mass. 1104, 695 N.E.2d 667 (1998) (citation omitted). Painting the picture a bit more completely:

> to make out the tort of intentional interference with a contractual relationship, a plaintiff must present evidence of "actual malice" or a "spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Shea v. Emmanuel College*, 425 Mass. 761, 764, 682 N.E.2d 1348 (1997) (*quoting Wright v. Shriners*

> corporate interests. To act with actual malice means to act with ill will to the point of wishing to do harm to the employee without right or justifiable cause.
> TR 14 at 106.
> No objection is made either to the propriety or the substance of this instruction in the defendants' motion.

*Hosp. for Crippled Children, et al.*, 412 Mass. 469, 476, 589 N.E.2d 1241 (1992)). In addition, "[w]hen an employer or supervisor is acting within the scope of his employment responsibilities, the hiring and firing decisions are privileged unless he acted with malevolence." *Walker v. Waltham Hous. Auth.*, 44 F.3d 1042, 1049 n. 1 (1st Cir.1995).

*McMillan v. Massachusetts Society For The Prevention Of Cruelty To Animals*, 140 F.3d 288, 308 (1 Cir., 1998), *cert. denied*, 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999).

Thus, to put a finer point on the argument, Breslin asserts that there was an insufficient evidentiary basis presented from which the jury could have concluded that he intentionally, with actual malice, interfered with Zimmerman's relationship with Direct.

■ As earlier noted, the defendants are not challenging the jury verdict on the retaliation claim in their post-trial motion. In finding that Zimmerman had proven her claim of retaliation under Massachusetts General Laws chapter 151B, the jury must have concluded, inter alia, that Zimmerman suffered adverse employment actions as a result of having filed an MCAD claim, that the lawful, non-discriminatory reasons articulated by the defendants for having taken those actions were false and that an objective, determinative reason that the adverse employment actions were taken was retaliation. (TR 14 at 99–100) In this case, the same adverse employment actions that the jury found constituted retaliation supply the "improper motive or means" in the intentional interference claim. On the continuum of human behavior, Breslin's conduct as established by the evidence is closer to that described in the case of *O'Brien v. New England Telephone & Telegraph Company*, 422 Mass. 686, 664 N.E.2d 843 (1996) than to that detailed in

*McMillan.* The jury was well within its province in determining that the defendant acted with actual malice toward Zimmerman.

The jury's resolution of the retaliation claim likewise undercuts Breslin's assertion that somehow his actions were privileged either consequent to his position as an officer of Direct or because he was advancing the interests of the corporation in taking them. The bottom line is that the jury concluded that Breslin engaged in unlawful conduct.[6] Such actions quite simply cannot be viewed as falling either within the legitimate scope of a corporate officer's employment or within the corporation's legitimate interests. At least on the facts of this case, to conclude otherwise would be to cloak a wayward supervisor with impunity for his unlawful acts. Judge Gertner's analysis of the issue, albeit in the context of a motion to dismiss, is persuasive:

The defendants argue that LeGoff has alleged neither that Strickler and Haines were motivated by "actual malice," nor that their alleged action were "in no way" within the scope of their employment or related to the University's corporate interests. "Malice," however, has traditionally been defined as acting with the unlawful purpose of harming the plaintiff, "without right or justifiable cause," *see Anzalone*, 526 N.E.2d at 248–49 (*quoting Walker v. Cronin*, 107 Mass. 555, 562 (Mass.1871)), a definition that Massachusetts courts have expanded to include intentional discrimination. *See Speen v. Crown Clothing Corp.*, 102 F.3d 625, 635 (1st Cir. 1996); *Comey v. Hill*, 387 Mass. 11, 438 N.E.2d 811, 816–17 (1982). Nor can unlawful acts—including unlawful gender discrimination, threats, and retaliation—be considered to be within the scope of a supervisor's duties. *Presto v. Sequoia*

---

6. The jury was charged that under Massachusetts law, it is unlawful for any employer to discriminate against any person because she has filed a complaint in any proceeding alleging unlawful employment discrimination, including discrimination based on sex or pregnancy. TR 14 at 99.

*Sys., Inc.*, 633 F.Supp. 1117, 1122 (D.Mass.1986). Therefore, in alleging that Haines and Strickler discriminated against her on the basis of gender, and threatened and retaliated against her for complaining of that discrimination, Le-Goff has made out a prima facie case of tortious interference. *See also Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 589 N.E.2d 1241, 1245 (1992) (no malice shown because "the corporation had a right to discharge" the plaintiff for the reason it did) (emphasis added); *Boyle*, 788 F.Supp. at 630 (suggesting that "intentional acts by a supervisor which caused an employee to resign" might be sufficient to make out a claim for tortious interference).

*Legoff v. Trustees of Boston University*, 23 F.Supp.2d 120, 129–130 (1998).

In short, Breslin's motion for a new trial on the intentional interference claim must fail.

Next the defendants take issue with the jury's award of punitive damages, claiming that there was no legally sufficient evidentiary basis to support it. Again no error is assigned to the charge given to the jury:

> Punitive damages are damages awarded for the purpose of condemning a defendant's unlawful conduct and deterring such conduct in the future. However, punitive damages are not available unless a further burden of proof is met. Ms. Zimmerman may receive an award of punitive damages if, and only if, you find that she has proven by a preponderance of the evidence that the defendant's conduct was outrageous because of its evil motive and/or because it exhibited a reckless disregard for the rights of others.

TR 14 at 116–7; *see Dartt v. Browning–Ferris Industries, Inc.*, 427 Mass. 1, 16–7, 691 N.E.2d 526, 536–7 (1998).

Rather, in the defendants' view, the jury did not follow the Court's instructions.

The Massachusetts Supreme Judicial Court has indicated that "trial courts...should...scrutinize punitive damage awards...to assure that they are not excessive or irrational." *Bain v. City of Springfield*, 424 Mass. 758, 768, 678 N.E.2d 155, 162 (1997) (citations omitted). In undertaking such a task, it is well to bear in mind that

> Although G.L. c. 151B does not provide any limit for punitive damages, the award of such damages is governed by common law and constitutional principles. *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 826, 678 N.E.2d 853 (1997). The Restatement (Second) of Torts § 908(2) (1979) provides that "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others."

*Dartt*, 427 Mass. at 16–7, 691 N.E.2d at 536–7; *Dichner v. Liberty Travel*, 141 F.3d 24, 33 (1 Cir., 1998); *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 826–7, 678 N.E.2d 853, 862 (1997) (citations omitted)("Common law and constitutional principles mandate that courts review the amount to ensure that it is reasonable and not simply a criminal penalty.")

The First Circuit decision in *McMillan* exemplifies the review that is to be undertaken. The language shall be quoted at length to get the full flavor of the inquiry:

> Fourth, defendants contend that Dr. McMillan's punitive damages award against the MSPCA on her pay discrimination claim should be set aside, or, alternatively, that a new trial should be granted on the issue. They challenge the punitive damages award on the basis that it was unwarranted, excessive, and obtained as a result of irrelevant testimony about Dr. Gambardella's termination of Dr. McMillan. We agree with defendants that the award was unwarranted and excessive.
>
> In a lawsuit such as this one, in which state law provides the basis of decision, "the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in

determining their amount, are questions of state law." *Browning–Ferris Ind. v. Kelco Disposal,* 492 U.S. 257, 278, 109 S.Ct. 2909, 2921, 106 L.Ed.2d 219 (1989). In reviewing an award of punitive damages, our role is to determine whether the district court abused its discretion in determining that the jury's award of punitive damages was within the confines of state law and that defendants are not entitled to a new trial or remittitur. *See id.* at 279, 109 S.Ct. at 2922. Although juries have wide discretion in determining the amount of punitive damages, and the trial court has broad discretion to affirm the jury's award of damages, *see Fishman v. Clancy,* 763 F.2d 485, 489–90 (1st Cir.1985), appeals courts should reduce or set aside awards that are "grossly excessive" or "shocking to the conscience," *id.* at 489 (*citing LaForest v. Autoridad de Las Fuentes Fluviales de P.R.,* 536 F.2d 443, 447 (1st Cir.1976)).

The jury in this case assessed punitive damages under chapter 151B against the MSPCA in the amount of $135,662.50 and against Dr. Thornton in the amount of $171,250. Although the statute authorizes punitive damages, *see* Mass. Gen. Laws ch. 151B, § 9, it does not specify when they should be awarded. However, other punitive damages provisions in Massachusetts law provide that such damages shall apply only on a finding that defendants' conduct was wilful, wanton, or reckless, *see,* e.g., Mass. Gen. Laws ch. 229, § 2, and the SJC has further refined the criteria, holding that punitive damages are warranted "where a defendant's conduct warrants condemnation and deterrence," *Bain v. City of Springfield,* 424 Mass. 758, 767, 678 N.E.2d 155 (1997).

Dr. McMillan contends that, because the jury found intentional discrimination, she was eligible for an award of punitive damages if the jury so decided in its discretion. We observe, however, that nowhere does Massachusetts law state that a finding of intentional dis-

crimination necessarily justifies an award of punitive damages. This accords with the logic that, even in situations involving intentional misconduct, compensatory damages may provide sufficient punishment and deterrence.

The district court's jury instructions on punitive damages were that the jury could award punitive damages if it found defendants' conduct to have been "egregious and beyond the pale of tolerable," and that such damages are "intended to punish the defendants as a warning, both to them and other likeminded individuals, that society will not tolerate grievous discriminatory behavior." The district judge further stated that "[a]ny sum you award as punitive damages should be commensurate with your own conscience, the outrageousness of the conduct that you intend to punish, and the character of the MSPCA as both an employer and as a nonprofit enterprise." As these instructions imply, above the inquiry for finding intent, the jury had to conduct a second inquiry to determine whether defendants' intentional conduct was egregious enough for an award of punitive damages. It follows, then, that just as we may review the record to determine whether a reasonable jury could have found that the defendants intentionally discriminated against Dr. McMillan, we may also review the record to determine whether a reasonable jury could have found defendants' conduct sufficiently worthy of condemnation and deterrence to justify exemplary damages.

Although we affirm the jury's finding of discrimination, we cannot say, on the basis of the record before us, that Dr. Thornton's and the MSPCA's intentional misconduct calls for punishment and deterrence beyond that secured by the compensatory award. Determining what conduct rises to the level at which an award of punitive damages is appropriate is a difficult task, but the evidence shows that the actions at issue in this

case do not. We therefore hold that the district court abused its discretion in upholding the award of punitive damages, and that the award of punitive damages in this case constitutes a grossly excessive award of damages that shocks the conscience.

*McMillan,* 140 F.3d at 306–7 (footnote omitted).

Turning now to a review of the evidence, Zimmerman testified that after she hand-delivered her discrimination charge to Breslin, her situation at the credit union got worse. (TR 5 at 86) After having received the MCAD complaint, Zimmerman observed Breslin "storming toward the front lobby very angry" and later saw him calling people into the board room. (TR 5 at 87–89) Zimmerman's concern was that Breslin "was now getting the other employees involved, driving a wedge between us." (TR 5 at 89–90) Although other members of management and directors had been told that their attendance at the annual meeting was expected, Zimmerman was not asked to attend the one held in March of 1997[7]. (TR 5 at 90) Zimmerman discovered that, alone among her colleagues, her early departures and late arrivals at work were being tracked. (TR 5 at 93–94, 100–102) All of a sudden Zimmerman began being called upon to attend meetings after the MCAD charge was filed, but her attempts to participate in them were brushed aside and Breslin essentially ignored her.[8] (TR 5 at 95–96) After a few months, Breslin stopped including Zimmerman at the meetings. (TR 5 at 95)

Zimmerman refused to sign her April, 1997 performance review which was conducted by her immediate supervisor, Joseph Capalbo ("Capalbo"),

Because I [Zimmerman] did not believe it to be an accurate reflection of my performance. I mean, even in areas in general, Mr. Capalbo continues to speak to the fact that my performance, because he is reviewing—the time period is 1996 plus three months in 1997, and so he is speaking a lot here to my performance, which he acknowledges is very good or excellent or stuff like that, but my scores are dropping even though he still seems to be commending my performance. And obviously the very big reason was the whole statement under the teamwork and telling me that my score was being lowered because I didn't react well to change and that I was not the same Celia that they knew before.

TR 5 at 122–123.

While in 1996 Zimmerman had been the planner, manager and facilitator of an off-site strategic planning meeting, in 1997 she was not included at all. (TR 5 at 116)

Breslin was Direct's spokesperson in answering Zimmerman's discrimination claim. (TR 5 at 123) Upon receiving the credit union's response to her MCAD charge, Zimmerman testified "I felt that I had an entirely new problem on my hands. It wasn't defending my position; it was now I had also my integrity had been challenged, complete character assassination." (TR 5 at 126) Subsequent to the filing of Direct's response, Zimmerman's situation at work continued to worsen.

For the first time since she returned from her maternity/medical leave, in July of 1997 Zimmerman was asked to attend a Board of Liquidity meeting. (TR 5 at 127) While before she had gone out on leave, Zimmerman had been a regular participant in that meeting who made frequent, significant presentations such as compiling and delivering all the management reports to the committee, at the July, 1997 meet-

---

7. Not only had Zimmerman attended prior annual meetings, she testified that she had always been repeatedly reminded by Breslin of the expectation and importance of attendance. (TR 5 at 90–91).

8. Zimmerman testified that at these meetings, Breslin "wouldn't address me. He would speak to someone else in the meeting about me as if I wasn't there." (TR 5 at 95).

ing her role "had something to do with investments." (TR 5 at 127)

A company meeting attended by all employees was held at some point shortly after Zimmerman gave notice of her intent to pursue her discrimination charge in court. (TR 5 at 128) Zimmerman was humiliated at that meeting by Breslin's comments about integrity and, in discussing Direct's long term incentive plan, about people that he would have expected would have already left the employ of the credit union. (TR 5 at 129–131) According to her testimony, she felt as though "a spotlight was shining on" her "and that the comments were directed specifically at" her. (TR 5 at 131) Other employees similarly thought that Breslin's comments were specifically directed at Zimmerman. (TR 5 at 132–133) For instance, Karen Clougher expressed her belief that Breslin's remarks were aimed at Zimmerman and she, Clougher, considered the meeting to have been a public humiliation for the plaintiff. (TR 5 at 133).

In November of 1997 Capalbo advised Zimmerman that Breslin wanted her to attend that month's board meeting which was to be held about four business days thereafter in order to make three presentations.[9] (TR 5 at 133–134) The subjects of these presentations were the preliminary budget for 1998, "the strategic goals and multiyear annual objectives for the credit union" and finally a comparative analysis of Direct's performance versus that of other credit unions. (TR 5 at 134–135) Although Zimmerman had, up until that point, been involved in the budget issue in the sense that she had been compiling data, she had done no work at the level required for the presentation to the board. (TR 5 at 135) Since her return from leave, Zimmerman had had no substantive involvement at all in the subject matters to be addressed in the second two presentations. (TR 5 at 135–136).

In the regular course at Direct

a board meeting took place, a little bit of downtime starting to think about what's coming up next, and then there would be a couple of weeks of building up. Presentations were generally known, or topics, a fair amount in advance. Mr. Breslin wanted to—essentially wanted to know in advance as best as possible every word that was going to be presented at that meeting. So anyone that was participating and presenting would spend a fair amount of time with Mr. Breslin either getting guidance or reviewing their presentations with him.

TR 5 at 136–137.

Contrary to the normal procedure, not only did Zimmerman receive these assignments merely days before the board meeting, she spent no time with Breslin in preparation for her presentations and received virtually no guidance from Capalbo despite having expressed concern to him about nature of the presentations. (TR 5 at 137–138).

Immediately prior to the start of the November 1997 meeting, the board went into executive session during which Breslin updated the members on the status of Zimmerman's lawsuit. (TR 5 at 138–141) While this was being done, Zimmerman was sitting outside the conference room with four colleagues. (TR 5 at 139–140) Shortly after the executive session, Zimmerman had to make her three presentations to the board. (TR 5 at 141) She testified that "I was felt (sic) like I was forced to get up there and give these three back-to-back presentations when all eyes were on me, not for the content of the presentation but the fact that I filed this lawsuit." (TR 5 at 142–143) Although the preliminary 1998 budget needed fine-tuning after its presentation to the board, Zimmerman had no further involvement with it after the November 1997 meeting. (TR 5 at 143) Zimmerman never attended

---

9. This was the first board meeting that Zimmerman had been asked to attend since she

returned to work at the credit union after her leave. (TR 5 at 138).

another board meeting after the one in November, 1997. (TR 5 at 143).

In early 1998, Zimmerman was assigned the goal of improving the compliance function at Direct. (TR 5 at 145) In connection with that task, Zimmerman attended "a compliance training course for training and certification" which was aimed at

> cover[ing] all areas of compliance issues that the credit unions are virtually faced with day in and day out in the business. One special topic that was discussed was year 2000 compliance, and the significance of that was discussed at the training course.

TR 5 at 145–146.[10]

Direct formed a team to deal with the issues surrounding year 2000 compliance issues, but at first Zimmerman was not asked to be a member of the team. (TR 5 at 148) When she was ultimately invited to be a participant, her role was to do spreadsheets. (TR 5 at 148–150).

In April of 1998, Capalbo gave Zimmerman a performance review covering the period from April, 1997 through March, 1998. (TR 5 at 150–151) Rather than sitting down to discuss the review as was the standard practice, Capalbo initially just handed it to Zimmerman and told her to take it with her. (TR 5 at 151–152) It was at Zimmerman's insistence that the two sat down to go over the performance review. (TR 5 at 152) Although Zimmerman's scores in several categories had decreased, Capalbo was basically unable to articulate reasons for the decline. (TR 5 at 152–153) The two did have a long discussion about the teamwork category, specifically regarding Zimmerman's evaluation of her own performance in a goal she had shared with Ken Bordiewicz ("Bordiewicz"), the director of operations at Direct. (TR 5 at 153–155) Capalbo had commented that he was "surprised" that Zimmerman would give herself a higher score than Bordiewicz had given himself.

(TR 5 at 154) Zimmerman was taken aback by the comment because she and Bordiewicz had agreed to give themselves the same score. (TR 5 at 154–155) Although Zimmerman requested that Capalbo look into the matter, he never got back to her on it. (TR 5 at 154–155).

After her meeting with Capalbo, Zimmerman went to Bordiewicz' office. (TR 5 at 155; TR 6 at 5) Bordiewicz advised that, as he and Zimmerman had agreed, he had submitted a rating of two for his performance on their joint goal. (TR 6 at 6) Thereafter, Bordiewicz was directed by Capalbo and/or Walsh to lower his score to three. (TR 6 at 7) In other words, Capalbo was aware that Bordiewicz' rating was being decreased, but never told Zimmerman. (TR 6 at 7).

Zimmerman had begun keeping a journal in early December, 1996, when she returned to work after her leave. (TR 17–18) She learned in 1997 that she would have to produce that diary to Breslin and Direct during the discovery phase of this litigation. (TR 6 at 18) The journal "contained records of events and conversations and employees that had been very supportive of [Zimmerman] who she identified in there." (TR 6 at 20) Zimmerman was concerned about turning the journal over to Breslin for a couple of reasons:

> One, that he would utilize the document to further segregate me from other employees, and I also—on top of my own fears and concerns at this point in time—felt like now I was also carrying the burden of what these other employees were going to go through.

TR 6 at 19.

After the diary had been produced to Breslin, over the course of a few days Zimmerman observed senior managers and other people mentioned in the journal frequently entering Breslin's office and exiting "visibly shaken." (TR 6 at 21) Zimmerman began being treated "like [she]

---

10. Zimmerman completed the course successfully and was certified as a compliance offi- cer. (TR 5 at 148) In 1998, she was the only Direct employee so certified. (TR 5 at 148).

had the plague." (TR 6 at 22) Being at work during those days:

> was awful. It felt like I was being put on this island, and I knew that these employees were feeling very intimidated and concerned, and now I was carrying around the burden of having them being pulled into something that I didn't want them to be part of.

TR 6 at 22.

In 1998 the goals assigned to Zimmerman were different in nature than those she had previously had. (TR 6 at 23) In one instance, although she was responsible for updating the surveys that compared Direct's products with those of other banking institutions, Zimmerman was never told about changes that had been made in certain of Direct's products, i.e., auto loans and Visa. (TR 6 at 25) Although she had no experience in the area, in mid–1998 Zimmerman was assigned to assist with the underwriting of home equity loans. (TR 6 at 26) Capalbo explained to Zimmerman that because Direct was going to permit a 100% home equity line, the anticipated volume of business was expected to be great and help was needed. (TR 6 at 27) It was unclear at the beginning how much of Zimmerman's time was to be devoted to underwriting, but Capalbo's expectation was that she was to do the underwriting in addition to her other responsibilities. (TR 6 at 28) Zimmerman spoke with Stephen Hagerstrom, the director of lending at Direct, and he advised her that it would likely take her thirty to forty minutes to write a home equity loan. (TR 6 at 29–30).

On or about May 14, 1998, Zimmerman fell in her office and injured her thumb. (TR 6 at 30) At Capalbo's suggestion, Zimmerman went to the emergency room and a temporary splint was applied. (TR 6 at 31) The next morning after telling Capalbo her diagnosis and prognosis, his comment was that she "need[ed] to make a better effort to get to work on time." (TR 6 at 32) As Zimmerman explained:

> I tried everything I could to not be late. Given the circumstances, I didn't want to be late. I got up early, my hand is painful, I'm on pain medication, I can't get my right hand wet because of the splint, so, essentially, I'm getting ready for work with one hand virtually that's useful, and it took me a little bit longer. You know, if, I wasn't in the condition—with the pain that I was in, the pain medication that I was given, along with the fact that it was my right hand, I think under normal circumstances, I may have considered a sick day because I was not feeling particularly good, but I felt like I was being scrutinized to a point where I needed to make the effort and I did. And I got in there shortly after 8:00, and was immediately criticized for not arriving on time.

TR 6 at 32–33.

After these events in May or June of 1998 Zimmerman began to feel overwhelmed and unable to concentrate, so she sought out professional help from a psychiatrist. (TR 6 at 39–40) As a result of advice from the doctor, Zimmerman did not return to work after the appointment with him. (TR 6 at 40–41) Capalbo questioned whether she was really sick, and asked her for a doctor's note after she had been out for a day and a half, although company policy was that a doctor's note was required after a five-day absence. (TR 6 at 41–42).

Zimmerman's testimony is buttressed by that of Stephen Hagerstrom ("Hagerstrom") who began his employment with Direct in 1994 as the director of lending. (TR 10 at 75) Subsequent to the MCAD filing by Zimmerman in March of 1997, Breslin questioned Hagerstrom with respect to certain allegations contained within the discrimination charge that were purportedly attributed to Hagerstrom. (TR 10 at 105) This inquiry involved whether Hagerstrom had been told to attend an annual meeting of the credit union, whether Hagerstrom was of the view that Capalbo's assignment was temporary and whether Hagerstrom had discussed his bo-

nus with Zimmerman. (TR 10 at 105–107) In September, 1997, when he opined that he thought Zimmerman was underutilized at Direct, Hagerstrom was told by Breslin to mind his own business.[11]

Hagerstrom described Zimmerman as being "stressed and upset", actually breaking down several times at work, from the autumn of 1997 until her ultimate departure from the credit union. (TR 10 at 109–110) According to Hagerstrom, Breslin and Capalbo treated Zimmerman "like the enemy" after she filed her charge of discrimination. (TR 10 at 111) Hagerstrom explained:

Q. And why do you say that?

A. I don't believe I saw Breslin speak to her. During meetings, he would ignore her opinion. And the couple of times that I know that they did interact, it was not in the same fashion as they had interacted before.

Q. Why do you say it was not in the same fashion?

A. If he even acknowledged her presence, she was rebuffed quickly.

Q. Did Celia Zimmerman's situation at the workplace appear to you to improve with the passage of time or get worse?

A. It got worse.

TR 10 at 111.

In late January of 1998, Hagerstrom was summoned to Capalbo's office to meet with Breslin and Capalbo. (TR 10 at 113, 116) During this meeting Breslin questioned Hagerstrom with reference to certain quotes that he, Breslin, had read the journal which had been produced by Zimmerman in the course of discovery in this case. (TR 10 at 116) The quotes harkened back to the subjects covered in the interrogation that had occurred after Zimmerman had filed her MCAD complaint. (TR 10 at 116–117) Breslin, whose demeanor was

"[a]ngry, intimidating, threatening", essentially accused Hagerstrom of having lied to him in the earlier interview and, after ten or fifteen minutes, told Hagerstrom to leave. (TR 10 at 117)

Later that same day Breslin called a second meeting, this time in his own office with Hagerstrom and Hagerstrom's boss, Joseph Walsh ("Walsh"), in attendance. (TR 10 at 120) Breslin greeted Hagerstrom by stating "if you don't like it here, why don't you just leave." (TR 10 at 117) During the course of this meeting which lasted over an hour, "Breslin read every quote that was attributed to [Hagerstrom] in the journal and some of the other quotes that other managers had said." (TR 10 at 121, 136) Among the quotes ascribed to Hagerstrom were, inter alia, words of encouragement to Zimmerman; the fact that Capalbo was a good person who was just doing what Breslin told him to do; a discussion between Hagerstrom and Zimmerman about the general nature of their respective bonuses; observations by Hagerstrom that Breslin was ignoring Zimmerman in management meetings; the opinion that when Zimmerman had been a member of the senior management team, it had been a very strong team[12]; the questioning as to why Zimmerman was not a participant in writing the credit union financial plan when she was "the best writer" in the group. (TR 10 at 122–125).

Further quotes from the journal involved Breslin's order to Capalbo to put the wire machine into Zimmerman's office; Zimmerman's inquiry into whether she was a good team player to which Hagerstrom responded "they hadn't exactly provided her with the opportunity to be part of the team"; Hagerstrom's view that everyone at the credit union was eligible for Direct 2000 except Zimmerman; and

---

11. This opinion was offered in response to an inquiry from Breslin as to whether Hagerstrom thought that Breslin had discriminated against Zimmerman. (TR 10 at 109).

12. After Breslin read Hagerstrom the quote regarding the strong management team, Breslin told Hagerstrom that he "shouldn't make comments about what a strong management team was." (TR 10 at 124–124).

There were some comments in which Celia [Zimmerman] asked me [Hagerstrom] whether somebody was keeping track of her late arrivals or early departures, and I responded, not that I knew of, and asked why they were doing it to her. It later went on, and there's another quote where I said Joe C., Joe Capalbo, did the strangest thing today. This was about a week or so later. Joe Capalbo came to me and said, can you tell me all of the days that you arrived late or left early.

TR 10 at 127–129.

Another Direct employee, Ned Cotter, was quoted in the diary as saying that "the reason [Zimmerman] was being treated the way she was by Mr. Breslin was the fact that she was a woman, a woman, and a woman, three times straight." (TR 10 at 126) Breslin told Hagerstrom that after he read that quote to Cotter, Cotter apologized to Breslin "like a real man." (TR 10 at 126) Breslin then told Hagerstrom that Hagerstrom "was not a real man. He [Breslin] said, he was a real man, that people would apologize to a real man, but [Hagerstrom] was not." (TR 10 at 126).

Other employees were called into Breslin's office on January 26, 1998. (TR 10 at 122) Hagerstrom observed that these employees appeared "normal" as they entered the office and "distraught" and "visibly upset" as they emerged. (TR 10 at 133–134).

On the following morning, Hagerstrom was again summoned to Breslin's office along with Capalbo and Walsh for a meeting concerning Zimmerman's diary. (TR 10 at 134) At the hour long January 27th meeting Breslin reread each of the diary entries that he had reviewed the prior day, adding comments to some. (TR 10 at 134) Among Breslin's remarks was that "he [Breslin] was a good man for doing a good thing for his friend and that he was going to heaven for it" and "he [Breslin] didn't understand why a talented guy such as [Hagerstrom] would stay at Direct in such a hot economy if [Hagerstrom] had obvious negative feelings towards him." (TR 10 at 134–135) Following these meetings Hagerstrom "was distraught", believed that he "was going to be fired" and "thought [his] career was over." (TR 10 at 138).

Hagerstrom described Zimmerman's state of mind after March of 1997 as "[u]nhealthy. She was upset and concerned about her standing at the credit union." (TR 10 at 139) After Zimmerman's diary had been produced in this litigation, "[s]he was upset that other people were going to be dragged into this case as a result of the journal." (TR 10 at 140).

Hagerstrom confirmed that Breslin assigned Zimmerman the task of underwriting the 100% home equity loans. (TR 10 at 141) It was estimated that it would take an inexperienced person approximately forty minutes to write a home equity loan, and that Zimmerman was being faced with twenty to thirty such loans daily. (TR 10 at 142).

■ Recalling that in deciding the issue before me, "...the court must draw all reasonable inferences in favor of the non-moving party" and "...must disregard all evidence favorable to the moving party that the jury is not required to believe," *Reeves,* —— U.S. at ——–——, 120 S.Ct. at 2109–2110, I find that a reasonable jury could readily conclude that Breslin acted with a vindictive motive and that he, both individually and by means of Capalbo, undertook a deliberate, calculated, systematic campaign to humiliate and degrade Zimmerman both professionally and personally. Her job responsibilities were minimized, her participation in meetings ignored and her performance reviews declined with no apparent explanation. It could reasonably be found that Zimmerman was unsuccessfully set up to fail by being assigned three presentations to be delivered to the board of directors with minimal time to prepare and no management support. At the same time this action could be viewed as one of vengeance given that the board was updated by

Breslin about the status of her discrimination case immediately prior to Zimmerman's presentations. A concerted effort appears to have been made to render Zimmerman a pariah amongst her co-workers. Most particularly, colleagues were individually confronted by Breslin with both the allegations of Zimmerman's MCAD complaint and passages from her journal, and basically intimated by him.

The jury was not required to believe Breslin's testimony as to why he acted as he did. Nor were they required to find that this was a situation in which a few isolated incidents occurred that were technically retaliatory and perhaps subjectively hurtful to the plaintiff. Finally, the jury was not required to find this a case of a mere "personality conflict" based on Breslin's dislike for Zimmerman or a situation in which Breslin was acting in a benign manner to allocation functions within Direct.

In short, to overturn the punitive damages award in this case would render hollow any assertion that juries have discretion as to whether to award punitive damages. From the record, a reasonable jury had more than an adequate evidentiary basis for finding that Breslin engaged in a vendetta against Zimmerman, and that his conduct, viewing the evidence in the light most favorable to Zimmerman, was, in the words of the *McMillan* case, "...sufficiently worthy of condemnation and deterrence to justify exemplary damages," *McMillan*, 140 F.3d at 307, or, in the words of the *Dartt* case, was "outrageous because of [his] evil motive or [his] reckless disregard for the rights of others." *Dartt*, 427 Mass. at 16–7, 691 N.E.2d at 536–7.

Breslin asserts that no evidence was elicited at trial with respect to his assets or income. Absent any such information, it is argued that the jury had no basis upon which to make a judgment about or

calculate a punitive damage award against him individually. *See, e.g., Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 207 (1 Cir., 1987)("a rich defendant may well be required to pay more than a poor one who committed the same wrong.") Consequently, in Breslin's view, the punitive damage award against him individually should be set aside.

Believing Breslin's position to be ill-conceived, Zimmerman counters by stating that there was sufficient evidence from which the jury could have inferred at least the level or range of Breslin's income, to wit, "the total assets of the credit union of which Breslin was the President and chief executive officer" and "a 1997 salary budget worksheet for the credit union (Exhibit 94) which listed the salaries of all employees of the credit union." [13] (Plaintiff's Opposition # 215 at 11).

The imposition of punitive damages is not an exact science, but a matter of judgment. The nature or extent of a defendant's assets would be but one factor to be considered. Although thin, the evidence and the proper inferences to be drawn therefrom afforded the jury with enough information about this single factor as to provide a sufficient basis upon which to render the judgment vis-a-vis Breslin.

### III. New Trial Or Remittitur

The standard by which a Rule 59, Fed. R.Civ.P., is measured differs from that applied under Rule 50:

A motion for a new jury trial enlists the sound discretion of the district court. "[A] trial judge cannot displace a jury's verdict merely because [s]he disagrees with it or would have found otherwise in a bench trial," or because "a contrary verdict may have been equally—or even more easily—supportable" on the evidence. "Rather, it must appear that the verdict is 'against the clear weight of the

---

**13.** The plaintiff notes that "[a]lthough Exhibit 94 was redacted, the jury could infer that Breslin's salary was at least $94,758, the highest salary listed in the salary budget worksheet." (# 215 at 11).

evidence.'" Otherwise put, it must appear that there has been a "manifest miscarriage of justice."

*Luson Intern. Distributors, Inc. v. Fabricating and Production Machinery, Inc.,* 966 F.2d 9, 12 (1 Cir.1992)(internal citations omitted); *see also Collazo–Santiago v. Toyota Motor Corp.,* 149 F.3d 23, 28 n. 6 (1 Cir.1998).

Although the defendants seek a new trial on the intentional interference and punitive damage claims, no discrete arguments distinguish this part of the motion from the motion for judgment as a matter of law except those regarding the alleged excessiveness of the punitive damage award.

In the *Labonte* decision, the SJC adopted as its own certain factors delineated by the majority in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), to be weighed when examining a punitive damage award:

> three main factors should be considered in determining if a punitive damage award is excessive: "the degree of reprehensibility of the defendant's conduct," the ratio of the punitive damage award to the "actual harm inflicted on the plaintiff," with a comparison of "the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." Where, as here, there is no cap on punitive damages, a judge or an appellate court must scrutinize the relationship between actual damages and the award of punitive damages. "[A] punitive sanction that is

tantamount to a severe criminal penalty [is impermissible]."

*Labonte,* 424 Mass. at 826–7, 678 N.E.2d at 862[14].

Consideration of the pertinent factors can be accomplished rather handily. As noted earlier, the jury could find that the defendants' actions in this case were truly vindictive towards Zimmerman on both a professional and personal level. Such conduct scores high on the scale of reprehensibility. The amount of the punitive damage award is not out of sync with the extent of the harm endured by the plaintiff which includes ongoing, debilitating depression and consequent devastating loss of earning capacity. Viewed in light of the extensive harm inflicted, a ratio where the punitive damage award is two times the compensatory damage award is reasonable. Moreover the defendants as much as conceded at oral argument that the relationship of $400,000 versus $200,000 is not out of line.

A comparison of cases is somewhat difficult given that each must be judged on its own unique facts. At least a few points can be gleaned from such a review, however. The award in the instant case is not the "windfall" described in *Rowlett,* where the punitive damage award was reduced from $3,000,000 to $300,000. *Rowlett,* 832 F.2d at 206–207. Nor is the present award one that might be seen as excessive such as the one in *Handrahan v. Red Roof Inns, Inc.,* 43 Mass.App.Ct. 13, 680 N.E.2d 568 (1997) where the jury awarded a total of $705,000 in compensatory damages and $1,000,000 in exemplary damages which

---

**14.** Although not the focus of the parties in their memoranda, the concurring opinion in *BMW of North America* was also cited with approval by the Supreme Judicial Court:

> We note that some of the other factors set forth in the concurring opinion may assist the trial judge in reconsidering a punitive damage award. In reviewing punitive damages, the judge may consider the following criteria: a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred; a reasonable

> relationship to the degree of reprehensibility of the defendant's conduct; removal of the profit of an illegal activity and be in excess of it so that the defendant recognizes a loss; factoring in of the financial position of the defendant; factoring in of the costs of litigation and encourage plaintiffs to bring wrongdoers to trial; an examination whether criminal sanctions have been imposed; an examination whether other civil actions have been filed against the same defendant. *Labonte,* 424 Mass. at 827, 678 N.E.2d at 862–3.

the trial court then reduced to $100,000. The case of *Danco, Inc. v. Wal–Mart Stores, Inc.*, 178 F.3d 8, 17–18 (1 Cir.1999) is inapposite in that it dealt "only with isolated acts of harassment by ordinary employees" with no evil motive or intent being imputed to management. The *McMillan* court determined, based on the record evidence, that it could not be found that the defendants' "intentional misconduct calls for punishment and deterrence beyond that secured by the compensatory award." *McMillan*, 140 F.3d at 307. As previously discussed, the facts at issue here warrant a different result.

A punitive damage award of $75,000 was upheld in *Dichner v. Liberty Travel*, 141 F.3d 24, 33–34 (1 Cir.1998). The actions at issue, described by the Court as "egregious conduct, worthy of condemnation and crying out for deterrence", revolved around events that transpired during two job interviews. A more substantial award is not foreclosed in this case where the retaliatory conduct not only continued, but escalated over a significantly longer period of time. As noted by Zimmerman, exemplary damage amounts in the range of $400,000 or greater have be awarded in the Massachusetts state courts. *See Hart v. City of Peabody*, 1996 WL 243457 (Mass.Super.)(award of $150,000 in compensatory damages and $500,000 in punitive damages); *Abramian v. President & Fellows of Harvard College*, 1998 WL 1182103 (Mass.Super.), *affirmed in part, vacated in part and remanded*, 432 Mass. 107, 731 N.E.2d 1075 (2000)(although trial court determined its punitive damage instruction to have been erroneous, it was noted that the $750,000 exemplary damage award was not excessive); *Walsh v. Carney Hospital Corporation*, 1998 WL 1470698 (Mass.Super.) ($650,000 punitive damage award determined not be excessive). Moreover, the Massachusetts Supreme Judicial Court has observed that "[w]e do not think, however, that an award of $100,000 (in punitive damages), even in the absence of any compensatory harm, would necessarily exceed the norms of rationality." *Bain*, 424 Mass. at 767–769, 678 N.E.2d at 161–162 (citation omitted).

Weighing the relevant factors, the $400,000 punitive damage award is not "grossly excessive" nor does it "shock[ ] the conscience." In all the circumstances of the case, a remittitur is not warranted.

## IV.  Conclusion

For all the reasons discussed, the arguments advanced in support of the defendants' post-trial motion are unavailing. A separate Order shall issue denying the motion.